[No. 7,473.—In Bank.]
February 7, 1882.

## SAN FRANCISCO GAS LIGHT COMPANY *v.* JOHN P. DUNN, AUDITOR, ETC.

MUNICIPAL CORPORATION—CONTRACT FOR SUPPLY OF GAS—POWER OF SUPERVISORS TO PROVIDE FOR LIGHTING STREETS—DELEGATION OF LEGISLATIVE POWER.—A contract was entered into between the City and County of San Francisco, May 24, 1869, containing the following provision:

"Upon the expiration of the term of five years, hereinbefore limited, the party of the first part (unless it shall elect and notify the party of the second part of its election to advertise for proposals, as hereinafter provided) shall purchase and take from the party of the second part all the gas required for lighting said City as aforesaid for another term of five years, dating from the expiration of the term, hereinbefore limited, and pay therefor at such rates as shall be agreed upon by a majority of a commission to be constituted: one commissioner to be appointed by the party of the first part, one by the party of the second part, and one by the two appointed. The contract was renewed under this provision in 1869; and afterwards, in 1879, after the taking of the appropriate steps, the following resolution was passed, on the seventh day of July of that year, by the Board of Supervisors: Resolved, that the rates to be charged for gas to be supplied to the City and County of San Francisco, by the San Francisco Gas Light Company, during the term of five years from the nineteenth day of May, 1879, as fixed by the commission, composed of J. O. Rountree, J. B. Haggin, and J. O. Eldridge, appointed and acting under and in pursuance of the contract existing between said City and County and said company, be and are hereby accepted, adopted, and approved, and the report of said commission was hereby adopted, ratified, and confirmed." In November, 1879, a claim for the amount due for the preceding month was presented by the plaintiff, and approved by the Board of Supervisors, and afterwards, having been presented to the defendant, and he having refused to audit the same, an appeal was taken to the Board of Supervisors, who finally approved and allowed the said demand; but notwithstanding such allowance, the defendant still refused to audit the same; and the petitioner applied for a writ of mandate.

*Held:* The Board of Supervisors had no lawful authority to delegate to persons not members of that Board the power to fix and determine upon the amounts to be paid by the City and County for gas, or to alienate from the Board its power of final determination with regard to such amounts; and the provision of the contract of May 24, 1869, for the renewal of that contract, was therefore void.

The resolution of July 7, 1879, is, however, to be read as if the report referred to were incorporated in it; and thus read, it fixes the rates which the city and county agreed to pay. Thus read, the final determination with respect to the rates to be paid was exercised by the Board of Supervisors, and not by the commission.

In the absence of an express limitation as to the period of time for which a contract may be made by the Board of Supervisors, the Court is not prepared to declare that such a contract for five years would be unreasonable. It may therefore be assumed, for the purposes of this decision, that the contract of 1879 is valid as an independent contract, unless prohibited by express statutory provision.

The proviso of the first section of the Act of April 3, 1876 (Stats. 1875-6, p. 854), prohibits the making of any contract for any purpose "binding said city for a longer period than two years;" and unless this proviso was repealed by the subsequent Act of February 25, 1878 (Stats. 1877-8, p. 111), the contract of 1874 was one which the Supervisors were not empowered to make, and any claim based upon such con-

tract one which they had no authority to allow.  It is, however, unnecessary to decide in this case whether or not the proviso was repealed.

The order allowing the plaintiff's demand was regularly published and passed, and was an action of the Board which they were empowered to take by sections 71 and 74 of the Consolidation Act.  They were not legally bound to allow the claim by reason of the contract of 1869 or of any renewal of that contract.  But the gas had been furnished the city, and they were fully empowered to provide for its payment such sum as it was worth.

APPLICATION for writ of *mandamus.*

*R. P. & H. N. Clement* and *William T. Wallace,* for Plaintiff.

*James A. Waymire,* for Defendant.

MCKINSTRY, J.:

The clause of the contract between the City and County of San Francisco and plaintiff, of May [19] 24, 1869, necessary to be recited, reads: "Upon the expiration of the term of five years, hereinbefore limited, the party of the first part (unless it shall elect and notify the party of the second part of its election to advertise for proposals as hereinafter provided) shall purchase and take from the party of the second part all the gas required for lighting said city as aforesaid for another term of five years, dating from the expiration of the term hereinbefore limited, and paying therefor at such rates as shall be agreed upon by a majority of a commission to be constituted: one commissioner to be appointed by the party of the first part, one by the party of the second part, and one by the two appointed."

On the twenty-fourth day of February, 1874, the Board of Supervisors were advised by the then City and County Attorney that the contract of May 24, 1869, was not legal and binding upon the city and county "so as to require the purchase of gas from said company during the second and third terms of five years, or either of them, therein mentioned, for the reasons following:   *   *   *   Second—The Board of Supervisors have no lawful authority to delegate to persons not members of that board the power to fix and determine upon the amounts to be paid by the city and county for gas, or to alienate from the Board its power of final determination, with

respect to such amounts." (Municipal Reports, 1874–5, p. 733.)

We fully concur with the view of the City and County Attorney as above expressed.

We also agree with the same officer that the adoption by order, duly published, of the sums agreed upon by a member of the Board, a representative of the plaintiff and a third person by them selected, is, in effect, the fixing by the Board of Supervisors of the sums to be paid by the city in a legal and binding manner. In his opinion, addressed to the Board February 28, 1876, with reference to the first renewal (so called) of the gas contract, the City and County Attorney said: "The contract of May 17, 1874, mentioned in resolution 8,293 (new series) as the renewal of said contract with the San Francisco Gas Light Company, on May 17, 1874, for a second term of five years, is a binding and valid contract, * * * not because of the contract of May 19, 1869, but because what was done on the part of the Board of Supervisors and on the part of the San Francisco Gas Light Company, on or about May 19, 1874, created a new contract, perfectly good under the statute, * * * from the time of the proceedings taken at the latter date." (Trans. fol. 141.)

On the seventh day of July, 1879, the following resolution —which was subsequently and on the eighteenth of the same month approved by the Mayor—was finally passed by the Board of Supervisors:

"Resolution No. 13,725. (New series.)

"*Resolved,* That the rates to be charged for gas to be supplied to the City and County of San Francisco by the San Francisco Gas Light Company, during the term of five years from the nineteenth day of May, 1879, as fixed by the commission composed of J. O. Rountree, J. B. Haggin and J. O. Eldridge, appointed and acting under and in pursuance of the contract existing between said City and County and the said company, be and are hereby accepted, adopted, and approved, and the report of said commission is hereby adopted, ratified, and confirmed.

"In Board of Supervisors, San Francisco, July 7, 1879,

after having been published five successive days, according to law, taken up and passed by the following vote :

"Ayes—Supervisors Foley, Mangels, Danforth, Rountree, Farren, Acheson, Scott, Haight. Noes—Supervisors Talbert, Smith, Gibbs, Brickwedel.

"(Signed)        John A. Russell, Clerk."

The rates fixed by the " commission " were before the Board in the report of Supervisor *Rountree.* The resolution is, of course, to be read as if the report referred to were incorporated in it; and thus read, it fixes the rates which the City and County agreed to pay. Thus the " final determination," with respect to the rates to be paid, was exercised by the Board of Supervisors, and not by the " commission."

Section 74 of the Consolidation Act empowers the Board "by regulation or order * * * to provide for lighting of streets," and by section 71 it is enacted " that the street-light *fund* shall be applied and used in payment for lighting the streets of the city, and for the repair of lamp-posts in pursuance of any existing or future contracts of the said City and County." It is not disputed that under these provisions of the charter the Supervisors have power by " order," duly published, to contract for the lighting of the streets. As we construe resolution 13,725 (new series), they did so contract.

It is urged, however, that the Board had no power to make such contract to run for a period of *five years.*

We entertain no doubt that the power conferred upon the Supervisors, " by resolution or order," to provide " for lighting the streets " includes a power to enter into an appropriate contract for carrying into effect the major power.   The power to provide for lighting the streets has been held, however, to be a governmental power, to be employed by the legislative department of the local government; such as can not be ceded away, nor used in such manner as shall control or embarrass future legislation.   " No legislative body can part with its powers by any proceeding so as not to be able to continue the exercise of them.   Such body has no power, even by contract, to control and embarrass its legislative powers and duties." (Cooley's Con. Lim. 205.)

In *East St. Louis* v. *Gas Light Company,* the Supreme

Court of Illinois said: "We do not think there can be a doubt that the power conferred on the city council to provide for lighting the streets and provide the means to pay for the same by taxation is legislative power." (10 Rep. 109, and cases therein cited.) It is not to be inferred, however, that a subsequent Board of Supervisors may disregard every contract entered into by their predecessors, or annul every such contract, even by formal legislative act. The power of the members of the Board to determine, on behalf of their constituencies, that it is expedient to secure the lighting of the streets, by a company or individuals, upon *certain terms*, is legislative. But when a contract (which the Board is authorized to make) is entered into between the Supervisors and a company or individuals, the corporation is as much bound by it as is any other person by his contracts. If, however, under pretense of carrying into effect a legislative power, conferred, the Board shall enter into such a contract as was evidently not intended to be authorized, or such as shall amount to a cession of the right of future legislation, the contract is invalid. In *East St. Louis* v. *Gas Light Company*, 10 Rep. 109, it was held that a contract giving to a company the exclusive privilege of lighting that city for thirty years was invalid. But in the absence of an express limitation as to the period of time for which a contract may be made, we would hold, perhaps, that the contract with the plaintiff for five years was not beyond the power of the Supervisors. The exigencies of the present case do not demand a determination of that question. We only say we are not now prepared to declare that such a contract, for five years, must necessarily embarrass the Supervisors or disable them from performing their legislative or governmental functions. (Dillon's Mun. Corp. 61.)

While, therefore, the attempt, by the clause of the contract of 1869 above recited, to transfer to "Commissioners" the power conferred by the charter upon the Supervisors, of determining what rates it might be expedient for the city and county to pay to a gas company five years in advance, is of no force or effect, because the Board had no power thus to cede to others their legislative function (and of this the Supervisors were fully informed by their legal adviser long

before the contract of 1879 was entered into by them), it may be assumed, for the purposes of this decision, that the contract of 1879 is valid as an independent contract, unless prohibited by express statutory provision.

An act of the Legislature was approved April 3, 1876, the first section of which reads as follows:

" If at the beginning of any month any money remains unexpended in any of the funds set apart for maintaining the municipal government of the City and County of San Francisco, and which might lawfully have been expended the preceding month, such unexpended sum or sums may be carried forward and expended by order of the Board of Supervisors in any succeeding month; *provided*, that said Board of Supervisors shall not hereafter make any contract for any purpose binding said city for a longer period than *two years.*" (Stats. 1875–6, p. 854.)

The *proviso* is certainly very explicit, and prohibits the *making* of any contract for *any purpose* " binding said city for a longer period than two years." If we could hold this language to mean simply that the city should not be bound, for a longer period than two years, by any contract which the Supervisors might make, we could command the Auditor to pass the claim as prayed for by petitioner herein, inasmuch as it is for gas furnished during the month of October, 1879— within two years after the contract of 1879 was entered into. It was the unmistakable intention of the Legislature, however, to deprive the Board of Supervisors of the power of entering into any contract which, by its terms, purported to bind the city for a longer period than that named in the proviso. The contract of 1879 was, therefore, one which the Supervisors were not empowered to make, and any claim *based upon such contract* one which the Supervisors had no authority to allow.

. But an examination of the record fails to show that the claim presented by the plaintiff, and allowed, audited, and approved by the Board of Supervisors, for gas consumed in the month of October, 1879, was based upon the contract of 1869, or the renewal thereof (so called) of 1879. The claim or demand itself refers to the authority on which it is based as follows:

" The above demand, being authorized by Section 1, Sub-

divisions 1 and 5 of an Act entitled 'An Act amendatory of an Act entitled an Act to repeal the several charters of the City of San Francisco, to establish the boundaries of the City and County of San Francisco, and to consolidate the government thereof, approved the nineteenth day of April, A. D. 1856,' and as amended by an Act amendatory thereof, approved the eighteenth day of May, A. D. 1861 (6), approved March 20, 1866." (Stats. 1865–6, p. 436.)

The portions of Section 71 of the Consolidation Law thus referred to are: "First, * * * the Board shall, in making said levy of said taxes, apportion and divide the taxes so levied and to be collected and applied to specific funds known as the Corporation Debt Fund, * * * *Street Light Fund*," etc.   "Fifth, the Street Light Fund shall be applied and used in payment for lighting the streets of the city and for the repair of lamps and posts, in pursuance of any existing or future contract of the said city and county."   As we have seen, there was, immediately prior to the action of the Board of Supervisors upon the claim of the plaintiff, no *existing contract* between the plaintiff and the city and county.   But after the claim or demand of plaintiff was presented, "duly verified in the form prescribed by law and the order of the Board," and on the 8th of November, 1879, said claim was referred by the Board of Supervisors to their Street Light Committee, by whom it was approved and indorsed, and on the same day the Board passed to print an authorization on the Street Light Fund for the payment of the amount of the claim, which was duly printed for five days thereafter.   On the 15th of November, 1879, the plaintiff's claim or demand was finally passed and approved by the Board of Supervisors, was approved and signed by the Mayor, was thereafter regularly published, and after such publication, and on the first day of December, 1879, "was taken up in open session by said Board of Supervisors, and by it allowed, passed, and ordered paid out of said Street Light Fund.

We have seen that by Section 74 of the Consolidation Act the Board were authorized, "by order," to provide for lighting the streets.   The order or ordinance allowing, approving, and ordering paid the demand of plaintiff for gas, etc., furnished the city in October, 1879, was regularly published and passed,

and was an action of the Board which they were empowered to take, by Sections 71 and 74 of the Consolidation Act. They were not legally bound to allow the claim by reason of the contract of 1869, or of any "renewal" of that contract. But the gas had been furnished the city, and they were fully empowered to provide for its payment *such sum as it was worth*. They have allowed a claim which they were authorized to allow, in such amount as the Board should deem *reasonable and just*. We must presume that they were of opinion that $22,514.80 was the fair value of the gas furnished and repairs done by plaintiff, during the month of October, 1879. Neither the Auditor nor this Court has power to review the judgment of the Supervisors with reference to the amount allowed to plaintiff as the actual value of the gas furnished and repairs made. As we have seen, the city and county is not bound by the contracts of 1869, 1874, or 1879, and no duty is cast upon the Board to audit or allow any claim of plaintiff, according to *the rates* mentioned in any one of those contracts. But each time a claim is presented by plaintiff, which is allowed in whole or in part by the Board of Supervisors, the latter employ their legislative function of deciding it to be expedient for the city and county to pay at the rates named in the bill, and also enter into a fresh contract to pay the sum allowed. This, as we have seen, they have power to do.

The allegation in plaintiff's petition, that the Board of Supervisors allowed the claim as "based" on the contract of 1869, can not influence the decision of this case. The allegation is not one of fact upon which an issue could be framed. The Board of Supervisors allowed the claim, and the defendant here, a ministerial officer, has no discretion to reject it; nor has he any authority to refuse to pass it unless the Board exceeded its powers in allowing it. The only facts capable of proof with respect to the allowance of the claim are proved by the record of the proceedings of the Board, which shows only the presentation of the claim and (after proper publication) the votes of the Supervisors allowing it in whole. That the members of the Board mistook the law, or supposed they were bound by an invalid contract when they voted to allow the claim, does not appear from the record of their proceed-

ings, and can never be made to appear legally until some method is invented for proving the unspoken thoughts of men. The presumption is, that they did their duty; and this presumption is not weakened by the circumstance that they had before them the opinion of the former legal adviser of the Board that the contract of 1869 expired in 1874, nor by the further circumstance that they had also before them the Act of 1876, which absolutely prohibited such a contract as was attempted in 1879.

Neither plaintiff nor defendant in the present action is at liberty to aver or admit the *motive* which induced members to vote for the allowance of the claim, except so far as the motive can be established by their formal and recorded action. The defendant here can only object that the Board had no power to allow the claim, and—without any intimation or suggestion that too much was, in fact, allowed—we say the members of the Board had the *power* to allow many times the actual value of the gas consumed if they dared to violate their official duty. They *alone* had power to determine the real value—their judgment is conclusive—and it is not a function of the Courts to make a contract for them, nor to set aside a contract which they had the capacity to make.

It follows that the authorization upon the Street Light Fund for the payment of the amount allowed was regular.

Let the writ issue as prayed for.

Myrick, McKee, and Sharpstein, JJ., concurred.

Ross, J., dissenting:

I concur in that portion of the opinion of Mr. Justice McKinstry (and in the reasoning by which it is supported) wherein he holds that the contract relied on by the petitioner is one which the Board of Supervisors had no power to make, and therefore no power to allow any claim by virtue thereof. And for that very reason I can not concur in the judgment. As I read the record, the claim of the petitioner is based on the contract, and its allowance was obtained by virtue of the contract, and not otherwise. The petition itself, in effect, so states, and that fact is so declared in the briefs of the counsel for the respective parties. I entertain no doubt that the

Board of Supervisors has the power to pass upon the claims of the petitioner for gas furnished the city, and to allow such sums therefor as may be reasonable and just; and that when so allowed, payment of such amounts can be compelled by petitioner. And further, as said by Mr. Justice McKinstry, that the Board has the power to contract for gas, upon such terms as it may seem proper, for any period not exceeding that limited in the Act of April 3, 1876, to wit, two years.

I dissent from the judgment.

THORNTON, J.:

I concur in the foregoing opinion.

McKINSTRY, J.:

After full consideration of the points presented at the re-argument, we see no reason to recall, or, except in a single particular, to modify the former opinion.

1. Counsel for petitioner have called our attention to the Act of February 25, 1878, "to regulate and limit the payment of money out of the treasury of the City and County of San Francisco." (Stats. 1877–8, p. 111.) The conclusion to which we have arrived renders it unnecessary to express any opinion as to whether the repealing clause in that act, and the omission therefrom of the *proviso* found in the Act of April 3, 1876, do or do not operate a repeal of the proviso.

2. The only question before us relates to the power of the Board of Supervisors to allow and authorize the payment of the "demand" attached to the complaint herein. That the Board has the power to allow a demand for the value of gas furnished during any month, provided the allowance shall not exceed one twelfth of the sum which may be expended out of the Street Light Fund during the year, we understand to be conceded. It is said, however, that the Board had no power to allow the particular demand, because it was based upon an illegal contract. We can not assume, however, that the members of the Board, who are not parties to this proceeding, were either ignorant of the invalidity of the contract, or fixed the value by reference to the terms of a contract which they knew to be invalid. The plaintiff here can not, by *averment*, validate a contract which the Board were not empowered to

make. Nor can the defendant, who could refuse to pass the allowed claim only in case the Board had no power to allow it, attribute to the members of the Board, by mere allegation, an improper employment of their discretion, or the adoption as a standard of value, of the prices mentioned in a *void* contract rather than the actual value of the gas, etc. No issue can be made with respect to the motives which actuated the members of the Board in the discharge of their discretionary duty. In determining the question of *power*, we can look only to the demand itself and to the action of the Board thereon. If, in any view, the Supervisors had the power to allow the claim presented, and did allow it, and order its payment in the *manner* prescribed by law, the Courts could not revise their action in a proceeding like the present—even if the Board were a party. But here neither plaintiff nor defendant represents the Board of Supervisors. The demand was presented, and the Supervisors decided that the gas had been furnished and the posts and lamps repaired as claimed. They also necessarily determined that the sum demanded was a just and reasonable compensation. They had power to allow a just and reasonable compensation, and they had no right to fix the value by reference to any other standard. But this last is an obligation of an imperfect character, addressed to the consciences of the members, and the Courts have no authority to enforce it, nor to annul the action of the Board where the record of their proceedings does not *affirmatively* show that they have resorted to an arbitrary standard, and have not adjudged a just and reasonable value. The Supervisors performed a task which they had power to perform, and we can not inquire (at least in this proceeding), whether in the hidden recesses of their minds were secreted influences, the product of error or corruption.

3. Counsel for respondent, in their last argument, referred to the Act of March 4, 1878, "to regulate the quality and standard illuminating power, and the price of gas in all cities in the State of California having a population of one hundred thousand or more." (Stats. 1877–8, p. 167.) The act was not called to our attention when the cause was first submitted. It requires the Legislature of every city of one hundred thousand or more inhabitants to fix the standard quality

and power of gas and the rate to be charged for each thousand feet—the standard illuminating power to be not less than that of sixteen candles, and the rate to be not more than three dollars per thousand cubic feet. It further provides that no person shall furnish gas to any such city, or its inhabitants, of less power or for a greater price, under penalty of one thousand dollars.

In the former opinion we said: "The members of the Board had the *power* to allow many times the value of the gas consumed if they dared to violate their official duty. They alone had the power to determine the real value—their judgment is conclusive—and it is not a function of the Courts to make a contract for them, nor to set aside a contract which they had the capacity to make." In view of the provisions of the Act of March 4, 1878, above referred to, it is manifest that the language quoted from the former opinion must be received with the condition that the Board has no power to allow more than three dollars for every one thousand cubic feet of gas furnished.

4. It has been further urged by counsel for respondent that the "demand" should have referred to the act of the Legislature last cited. But a reading of the Act of March 4, 1878, will show that it furnishes no authority for *any* demand upon the treasury of the city and county.

As we said in the former opinion, the demand of the plaintiff refers to subdivisions of Section 71 of the Consolidation Act, which provide for the creation of a "Street Light Fund," and for the application of such fund to the lighting of streets and the repairing of lamps and posts. The reference is distinct to the law authorizing the payment of the demand by title, date, and section. It is a more appropriate reference than would have been one of Section 74 of the Consolidation Act, which in general terms confers power on the Board "to provide for lighting the streets."

5. Further, with respect to the Act of March 4, 1878, we are asked by counsel for respondent to *assume*—in the absence of any evidence, and of any averment in the pleadings, to that effect—that the Supervisors violated the act by allowing more than three dollars a thousand for gas, and that the officers and agents of plaintiff have subjected themselves

to the penalty therein provided. For aught that appears in this case, every requirement of the Act of March 4, 1878, has been fully complied with by the Board of Supervisors.

6. It was suggested by respondent that this Court should set aside the allowance of plaintiff's demand, because the rates allowed are not "reasonable." In aid of this view resort was had to the proposition—supported by innumerable adjudications—"Municipal by-laws must be *reasonable.* Whenever they appear not to be so, the Court must, as a matter of law, declare them void." The statement as applied to the facts of the case before us involves some confusion of thought and expression. The power of the Board of Supervisors to pay for gas furnished comes from the *statute* and not from any by-law. The statute confers on the Board the power of determining what is just and reasonable compensation for gas which may be supplied; with the proviso that not more than three dollars per thousand feet shall be allowed. By-laws, or ordinances (an equivalent word), are in the nature of local laws, and the cases establish that they must be reasonable; that is to say, they must not be oppressive, nor inconsistent with the principles of the Constitution or of the common law having relation to the liberty of the citizen or the rights of private property. Even with respect to an ordinance apparently unreasonable, the Courts will not hold it to be unreasonable if the Legislature, by a constitutional law, has expressly authorized the municipality to adopt it. If the allowance of a claim can be called an ordinance at all—within the meaning of the rule as to reasonable ordinances—the Consolidation Act in terms empowers the supervisors to allow demands for various supplies, including gas, in such sums as in their judgment may be just. This Court constitutes no part of the municipal government.

The question before us is simply, Does the law confer on the Board of Supervisors the *power* of deciding what shall be paid for gas supplied—with the single limitation that the maximum allowed shall not exceed three dollars per thousand feet ?

If it be true, as stated by counsel, that the Supervisors have allowed or paid too much for gas (a fact of which we can not

take judicial notice), the responsibility must rest where it belongs. The present proceeding can not be made the means of transferring to this Court the legislative duties, or the discretionary and prudential functions which are assumed by the representatives of the people in the local government.

In our opinion, the writ should issue as prayed for.

McKEE and MYRICK, JJ., concurred.

SHARPSTEIN, J., concurring:

I concur in the judgment awarding the writ prayed. But the ground upon which I concur obviates the necessity of my expressing any opinion upon the question so ably discussed by Mr. Justice McKinstry.

On the last hearing a point was brought prominently before the Court which, if presented at any former hearing, escaped my observation, and I infer that it also did that of the other members of the Court, as no allusion was made to it in any of the opinions heretofore filed.

The question to which I now refer is this: What are the functions of the Auditor in respect of a demand which has been approved and allowed by the Board of Supervisors, on an appeal to it from a disallowance by him?

The section of the Consolidation Act which provides for such an appeal reads as follows:

" If any person feel aggrieved by the decision of the Auditor, or other proper officer or officers of said city and county, except the Board of Education, in the rejection of or refusal to approve or allow any demand upon the treasury presented by such person, he may appeal, and have the same passed upon by the Board of Supervisors, *whose decision thereon shall be final;* and if the said Board shall approve and allow the demand, it shall afterward be presented to the Auditor, and entered in the proper book, in like manner as other demands allowed by him, and an indorsement must be made of its having been so entered before it can be paid."

What is the obvious import of the language here employed to express the intention of the Legislature? On behalf of the respondent, it is contended that it means that after the Auditor has refused to audit a demand, and an appeal has

been taken from his decision to the Board of Supervisors, and his decision reversed by that body, he may after that, on the subsequent presentation of said demand to him, refuse to enter it in the proper book, " in like manner as other demands allowed by him," and that his decision thereon must be held to be final.    In other words, the act should be construed as it would be if, instead of the word " final," the words "persuasive only" had been used to define the effect of a decision of the Board upon an appeal from the decision of the Auditor.  And the entire clause, if reconstructed so as to plainly express what is claimed to be the obvious intention of the Legislature, would read as follows :  " If any person feel aggrevied by the decision of the Auditor,     *     *     *     in the rejection of or refusal to approve or allow any demand upon the treasury presented by such person, he may appeal and have the same passed upon by the Board of Supervisors, whose decision thereon shall be *persuasive only ;* and if the said Board shall approve and allow the demand, it shall afterward be presented to the Auditor, and entered, *if he sees fit to enter it,* in the proper book, in like manner as other demands allowed by him, *and his decision thereon shall be final."*  I say *final,* because the counsel for the respondent claims that no appeal lies from the Auditor's refusal to enter a demand upon the proper book, etc., after it has been approved and allowed by the Board on appeal from his first refusal to audit and allow it.

Upon that construction, it would have to be held that the law provided for reciprocal appeals in the same case—one from the Auditor to the Board, and one from the Board to the Auditor.   But as I view it, there is nothing in the language of the act which would lend the slightest countenance to such a construction of it.

After a demand has been presented to and approved by the Board of Supervisors, it must be presented to the Auditor for his allowance, and he may allow it or not, as he sees fit.   If he does not allow it, and an appeal is taken to the Board of Supervisors, and that body reverses his decision, he has after that but one function to perform, and that is to enter the demand "in the proper book, in like manner as other demands allowed by him."

The proceeding which is here provided for is somewhat, if not quite, analogous to that provided for in cases where appeals are taken from one Court to another. It is usual in such cases to send a *remittitur* from the appellate to the lower Court, containing the decision of the former, which the Clerk of the Court below is required to attach to the judgment roll, and enter a minute of the judgment of the appellate Court on the docket, against the original entry. That the duty which he is required to perform is purely ministerial, no one can doubt. Neither can it be doubted that the appellate Court would compel him to perform it, even if the Court of which he was Clerk should order him not to make the proper entry. Nor would an appellate Court, in a proceeding by *mandamus* to compel the Clerk to make such an entry as the law requires to be made in such cases, permit its jurisdiction to render the decision which it had rendered to be questioned.

A decision by an appellate Court is final when the law declares it shall be final. Is it conceivable that when the Legislature declared that a decision of the Board of Supervisors should be final, it meant that it should not be final? That an appeal should lie from it to the Auditor, and that his decision should be final? Nothing of the kind is expressed in the act, and as the direct reverse of that is expressed, I may safely add that nothing of the kind is implied.

But it is urged that this reasoning will not apply to a case in which the Board of Supervisors have no power to allow a demand—in which their action is *ultra vires*. It will probably be conceded that the Board has all the power which the law confers upon it, and that while acting within the scope of the powers so conferred, its action can not be held to be, in any sense, *ultra vires*. Among the powers conferred upon the Board is that of "providing for lighting the streets." That undoubtedly implies the power to pay for it, unless it can be obtained for nothing.

But it is said that they can not pay for what they have had because they contracted for more than the law authorized them to contract for. On the other hand, it is contended that there was no law in force at the time the contract was made which forbade its being made for the period specified in it. And it is further contended that if there was, it would

not absolve the municipal corporation from the obligation to pay for what it has consumed. Now, these are questions which arose when the demand of the plaintiff was presented to the Board of Supervisors for allowance. And it had to be presented to and approved by that Board before it could be allowed by the Auditor, "or in any manner be recognized or paid." (Sec. 85, Consolidation Act.) And unless so presented within one month after it accrued, if in the power of the holder to present it within that time, it would become forever barred by limitation of time. (Id., sec. 90.) Now, if the Board of Supervisors had no jurisdiction to pass upon that demand, it was worse than idle to present it to them, because they had no power to allow or disallow it. But the question upon which its allowance or disallowance hinged was one which had to be decided before the demand could properly be allowed or disallowed. If the contract was a valid one, the demand was a valid one, and it was the duty of the Board to allow it. And, as before stated, that question had to be decided by the Board. The demand had to be presented to it, and if allowed by it, to be presented to the Auditor. If disallowed by him, the party aggrieved had a right to appeal to the Board, and the decision of the Board on that appeal is by the law made final. If that be so, what is the use of having an Auditor? asks the respondent's counsel. If it be not so, what is the use of having a Board of Supervisors? might be asked with quite as much propriety. If it was the design of the Legislature that the decision of the Auditor should be final, it is impossible to conceive why an appeal from that decision should have been provided for, with the further provision that the decision of the appellate tribunal should be final.

I am unable to find anything in the Consolidation Act which, to my mind, indicates an intention to clothe the Auditor with the supervisory powers which it is claimed in this case that he possesses.

It seems to me that he is placed where he is to check what may be termed the hasty or inconsiderate action of the Board of Supervisors upon demands presented to it. That after a demand has been allowed by it, it must be presented to and examined by him before it can be paid. If there are in his

judgment valid objections to its allowance, he must disallow it. But from that decision an appeal lies to the Board, and if after considering the objections of the Auditor it determines that the demand shall be paid, his duty thereafter in respect of the demand is purely ministerial, and such only as the law prescribes.

It is a mistake to suppose that the Board had jurisdiction to decide right and not to decide wrong. If it had jurisdiction to decide the question right, it had jurisdiction to decide it; and whether right or wrong, its decision was final until reversed or annulled by some tribunal having jurisdiction to reverse or annul it. I am clearly of the opinion that the respondent did not possess that jurisdiction. And it seems to me that this view of the matter is strongly supported by the recent case of the *Bank of California* v. *Shaber*, 55 Cal. 322. It appeared in that case that the plaintiff held a judgment against the city and county which the Board of Supervisors had ordered to be paid. After said order was made, but before payment was made, an appeal from the judgment to this Court was duly perfected by the City and County Attorney. The appeal stayed all proceedings upon the judgment, and the treasurer refused to pay it.

But this Court, upon the application of the plaintiff, issued a writ of *mandamus* commanding the treasurer to pay it, notwithstanding the pendency of said appeal. The Court, among other things, said: "In this case the determination of the Board not to prosecute an appeal, and the making of the order for the payment of the claim, terminates the functions of the attorney and counselor in regard to the suit and its conduct, and he was relieved of all further responsibility in the matter; he had no authority to review, reverse, or postpone the action of the Board." If the Auditor has any power to review, reverse, or postpone the action of the Board upon an appeal from his refusal to allow a demand, he must derive it from some source to which my attention has not been directed. It is as much the duty of the City and County Attorney to prevent the recovery of improper judgments against the city and county as it is of the Auditor to prevent the payment of unjust demands against it. But the powers of both of these officers are prescribed and limited by law.

But it is asked, What remedy would the people have if the Board of Supervisors should make an erroneous decision? The same that they would have if the Board and the Auditor should concur in the allowance of a demand that they ought not to have allowed. No one will claim that infallibility could be secured by providing that the decisions of the Board should not become final until concurred in by the Auditor.

A judgment becomes final when the law declares that it shall be final, and, except as otherwise provided in the Constitution, the Legislature has the power to make the decision of any court, tribunal, board, or officer final. Whether it be so or not, does not depend upon the infallibility of the tribunal by which it is rendered.

As before stated, I think the action of the Auditor upon a demand which the Board has allowed upon an appeal from his disallowance of it is purely ministerial, and that the only steps which he can take after his decision has been reversed are plainly pointed out in the law by which he must be guided. If that be so, it seems to me that the answer of the respondent is clearly insufficient. In *The People ex rel. Bush* v. *Collins,* 7 Johns. 549, a town clerk refused to record a survey made by a board of commissioners, because, as he alleged, one of them had not taken the oath of office, and filed a certificate thereof with the clerk according to law. In awarding a peremptory writ of *mandamus* to compel the clerk to record said survey, the Court said: "It certainly did not lie with the defendant, as a mere ministerial officer, to adjudge the act of the commissioners void. It was his duty to record the paper; *valeat quantum valere potest.* It was enough for him that those persons had been duly elected commissioners within the year and were in the actual exercise of the office."

In another case a ministerial officer refused to perform certain duties devolved upon him by a law which he insisted was unconstitutional. The Court said that it did not lie with a ministerial officer to raise that objection, and that he must perform the duty which the law imposed upon him. (*Smyth* v. *Titcomb,* 31 Me. 272.)

Ross, J., dissenting:

I think the writ should be denied. When this clause was

last considered here it was agreed by all of the Judges who expressed an opinion on the point, that the contract entered into between the Board of Supervisors of the City and County of San Francisco and the Gas Company, in May, 1879, was invalid, because expressly prohibited by the Act of the Legislature approved April 3, 1876. At that time the subsequent Act of February 25, 1878, was not called to the attention of the Court, and consequently was not considered. It is now urged on behalf of the company that this latter Act repealed by implication the Act of April 3, 1876, and that therefore the contract in question was not prohibited by law, but was one the Board of Supervisors was empowered to make.

An Act of April 3, 1876, is entitled "An Act to confer additional powers upon the Board of Supervisors of the City and County of San Francisco, and upon the Auditor and Treasurer thereof," and is in these words: "If at the beginning of any month any money remains unexpended in any of the funds set apart for maintaining the municipal government of the City and County of San Francisco, and which might lawfully have been expended the preceding month, such unexpended sum or sums may be carried forward and expended by order of the Board of Supervisors in any succeeding month; *provided*, that said Board of Supervisors shall not hereafter make any contract for any purpose binding said city for a longer period than two years."

The enacting clause of this statute, as will readily be seen, relates entirely to the disposition of certain unexpended funds of the city. It is this enacting clause that it is said was impliedly repealed by the Act of February 25, 1878. And the argument is that such repeal of the enacting clause necessarily repealed the proviso. That depends on the nature of the proviso. Undoubtedly the office of a proviso generally is, as was said by the Supreme Court of the United States, in *Minis* v. *The United States*, 15 Pet. 445, " either to except something from the enacting clause, or to qualify or restrain its generality, or to exclude some possible ground of misinterpretation of it, as extending to cases not intended by the Legislature to be brought within its purview." Yet, that a proviso *may* contain provisions broader than the enacting clause, and lay down a general rule of a permanent nature

applicable to all cases, is impliedly admitted by the Court in the same case. (15 Pet. 445.) In construing a statute, as in construing a contract, deed, or other instrument, the paramount object is to ascertain—from the language employed—the intention of the party making it. What, then, did the Legislature intend when it said, in the proviso to the Act of April 3, 1876, that " said Board of Supervisors shall not hereafter make any contract for any purpose binding said city for a longer period than two years " ?

This language, it seems to me, is very explicit, and prohibits the *making* of *any* contract, for *any purpose,* binding the city for a longer period than two years. In no respect can it be satisfied by confining its operation to the unexpended balance of the city funds referred to in the enacting clause. To do this would be to restrict, where the obvious meaning of the language employed admits of no restriction. It was the unmistakable intention of the Legislature, I think, to deprive the Board of Supervisors of the power of entering into any contract which, by its terms, purported to bind the city for any longer period than that named in the proviso. Inasmuch, therefore, as this prohibition was not confined to the subject-matter of the enacting clause, it follows necessarily that the implied repeal of the latter could not have the effect of repealing the prohibition—more especially in view of the rule that repeals by implication are not favored. (Sedgwick on the Construction of Stat. and Const. Law, 2d edition, pages 105, 106.)

The objection made to the Act of 1876, on the ground that the subject of the proviso is not stated in the title of the Act, can not be sustained for the reason that the Act was passed prior to the adoption of the present Constitution, and it is settled by a long line of decisions in this State that the provision in the old Constitution requiring the subject of the Act to be expressed in its title was merely directory. With respect to laws passed under the old Constitution, we are bound by those decisions, although it is otherwise with respect to those passed under the new.

The Board of Supervisors having had no power to make the contract in question, it had no power to allow any claim based upon it. As I read the record in this case, the claim of

the petitioner is based on the contract, and its allowance was obtained by virtue of the contract, and not otherwise. As the Board lacked the power in the first instance, I am unable to see how the refusal of the Auditor to audit the claim, and the subsequent appeal from such refusal back to the Board of Supervisors, could confer it. The illegality of the allowance in the first place came from the fact that it was based on a contract expressly prohibited by statute. The same consideration, in my opinion, rendered invalid the allowance made on the appeal from the Auditor's refusal to audit the claim. I do not understand that *mandamus* can ever be resorted to, to compel the auditor to enter in his book a claim based on a contract prohibited by statute.

I will add that I entertain no doubt that the Board has the power to pass upon the claims of the petitioner for gas furnished the city, and to allow such sums therefor as may be reasonable and just; and that when so allowed payment of such amounts can be compelled by petitioner.

THORNTON, J., dissented.

(MORRISON, C. J., being disqualified, took no part in the decision of this case.)